UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

PETER JAMES AMANTE,

          Petitioner,

    vs.

TIM VIRGA,

          Respondent.

Case No:  C 11-00975 SBA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Through counsel, Peter James Amante ("Amante" or Petitioner") has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 to challenge his state conviction for first degree murder arising from the stabbing death of Ignacio Gomez ("Gomez").  Having read and considered the papers submitted, and being fully informed, the Court DENIES the amended petition.

## I.  BACKGROUND

### A.  STATEMENT OF THE CASE

      On February 5, 2005, an information was filed in the Sonoma County Superior Court charging Amante, Javier Cardenas ("Cardenas"), Rico Ricardo Lopez ("Lopez"), Patrick George Higuera Jr. ("Higuera") and Mario Ochoa-Gonzalez ("Ochoa") with one count of murder in violation of Penal Code § 187(a).[1]  The information further alleged: (1) an enhancement under Penal Code § 186.22(b)(1) that the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members; and (2) a special circumstance under Penal Code § 190.2(a)(22) that the defendants intentionally killed the victim while they were active participants in a criminal street gang, and that the

---

[1] For simplicity, Petitioner, Cardenas, Lopez, Higuera and Ochoa collectively will be referred to as "defendants."

crime was carried out to further the activities of the gang. 6 CT 1072-1073; see also 2 CT 220-223, 261-262.

On August 31, 2005, a jury convicted Petitioner, Cardenas, Lopez, and Higuera of first degree murder and found true the gang allegations. 11 CT 2144-2158; 28 RT 6943-6952.  Ochoa was acquitted of murder, but was convicted of being an accessory-after-the-fact.

The trial court sentenced Petitioner to prison for life without possibility of parole. 13 CT 2481.  Petitioner filed a timely notice of appeal to the California Court of Appeal. 13 CT 2625. On September 3, 2009, the state appellate court issued a reasoned, unpublished opinion affirming the judgment.  Exh. C (People v. Amante, No. A113655, 2009 WL 2850354 (Cal. Ct. App. Sept. 3, 2009)).  On December 17, 2009, the California Supreme Court denied Petitioner's petition for review.  Thereafter, Petitioner filed the instant action, which alleged twelve claims for relief.  The Petition has been fully briefed and is ripe for adjudication.

### B. FACTUAL SUMMARY

The factual background is taken from the state appellate court's decision on direct appeal:

> We summarize the underlying facts, viewing the evidence as a whole and in the light most favorable to the prosecution. . . . On the night of June 26, 2002, defendants were hanging out at defendant Amante's apartment on Stony Point Road in Santa Rosa, where he lived with his fiancée Kacee Dragoman and their small child. Defendants were all members of the Norteño street gang. Amante's mother, her boyfriend, Dragoman, Lindsey Ortiz (Amante's teenaged cousin, who lived in a nearby apartment), and Amante's and Dragoman's young son also were present at the apartment.  Defendants were drinking beer, playing cards, and watching television.  Amante's mother and her boyfriend eventually went upstairs to bed.
>
> Dragoman and defendant Ochoa were talking on a patio outside the living room around midnight, when people heard whistles coming from outside the apartment. According to various witnesses, including the prosecution's expert witness on criminal street gangs, members of the Sureño gang and other Mexican nationals use a particular whistle to identify themselves. Dragoman testified that when she heard the whistle, "It was a bad sign. It's a rival gang whistle." Ochoa reported that he heard the whistle coming from the other side of a fence

that separated the apartment from Santa Rosa Creek and that there were "Scraps" (a derogatory term for a member of the rival Sureño gang) in the area. At the time, members of the Norteño and Sureño gangs had rival claims to the area by the creek near Stony Point Road. Ochoa also whistled. Defendants ran quickly to the kitchen, opened drawers, then left the apartment; Dragoman and Ortiz followed.

On a nearby bridge on Stony Point Road in a parked car were Rebecca Sandoval (Rebecca) and her small child and stepchild; her husband Miguel Sandoval (Miguel) was outside the car speaking with his father. Miguel had seen his friend Ignacio Gomez (who he knew only as "Jose," another name Gomez went by) riding his bicycle on the bridge. Gomez lived with his fiancée in a nearby homeless camp, where he bought and sold methamphetamine and heroin. According to Gomez's fiancée, Gomez was not a gang member, but his friends were associated with the Sureño gang, and he typically wore blue clothing, which was associated with the Sureño gang. Jose, Miguel, and Miguel's father whistled to each other on the bridge and greeted one another.

Rebecca testified that she "heard people jumping a fence," and shortly thereafter she saw Ochoa (who she recognized from a youth center) and someone else head toward the bridge she was on. They were followed about a minute or a minute and a half later by Higuera (an acquaintance of Rebecca's) and another man she did not recognize. As the four men crossed the bridge, one of them said, "'What's up'" to Miguel, and another said "'Norte.'" The four crossed the bridge, then three of them went down a bike path under the bridge; Ochoa stayed back.

Dragoman and Ortiz, who were the last to leave Amante's apartment, walked down a path and found Amante (who was wearing a red 49ers jersey) stuck by his pants leg on the fence separating him from the creek. Ortiz described Amante as drunk. While Dragoman and Ortiz were loosening Amante's pants from the fence so that he could get down, a large butcher knife fell from Amante's pocket.

After Amante was freed from the fence, he picked up the knife he had dropped and ran to the people near the car parked on the bridge on Stony Point Road; Amante was holding the knife as if he were going to stab someone. Dragoman and Ortiz left the apartment complex through another route and met up with Amante at the bridge. Amante spoke to the people in the parked car, then dropped the knife he was holding. Dragoman testified that she believed Amante picked up the knife and put it in his pants. Amante crossed the bridge (which was illuminated by street lights), then ran down the path to the creek where the three other defendants had gone. Ortiz followed him but at first could not see anything because it was so dark. Dragoman testified that she saw Amante walk down, meet up with Higuera, Cardenas, Ochoa, and Lopez, then walk back up to the bridge 30 seconds later.

Miguel testified he saw five males and two females on the night of the murder. One of the men asked Miguel if he "bang[ed]

Norte," and Miguel answered that he was just talking to his father. Miguel interpreted the question about banging Norte as "he just wanted problems. But at that time, I mean, I'm not a gangster, so, you know, I just told him I don't bang nothing." Miguel saw a black handle in the pocket of the man who asked if he banged Norte, but he did not know whether it was a knife. Miguel testified that Gomez rode his bicycle down a path under the bridge. Miguel testified that "that's when I heard they stop him, they stop Jose, and that's when I— when that happened." When the men stopped Jose, Miguel heard one of them ask Jose whether he was a Sureño. He testified that he heard people hitting Gomez and calling him "a lot of bad words," and he heard Gomez yelling "help" and screaming. Miguel saw three men (the person who asked if he "bang[ed] Norte" and two others) hitting Gomez, and he saw one of the men stabbing Gomez with a knife. During the attack, a man wearing a red 49ers jersey over a tank top approached Miguel, dropped a knife on the ground in front of Miguel's car, then picked it up and ran toward the other men. Miguel testified that the man "went all the way to with the other guys where Jose was and the other guy, one of the girls was telling him to stop. And that's when my friend Jose, I heard he was not screaming no more. That's when the other guy and the other two girls came with him to see what happened." He also testified that "the first time I thought it was just fighting, but when the guy—the other guy came running and he dropped a knife, I know something was happening because he was yelling, and after that he just—he was so quiet." After the man who dropped the knife started running to catch the other guys, "[t]hey were all fighting. And that's when the other guy and the two girls came all together. That's when—when there was no noise. And that's when I heard the bike fall on the floor."

Gomez suffered 38 to 40 stab wounds on his head, face, chest, back, and shoulders; he died from multiple wounds to the torso after being stabbed in the heart and lungs. It could not be determined whether one or more stabbing instrument was used. A forensic pathologist opined that one person could have inflicted all of the stab wounds in less than a minute, and that the victim lived only a couple of minutes after he was stabbed in the heart.

Approximately five minutes after Ortiz had started down the path, Ortiz saw Ochoa (who was not armed) coming up the path. He was followed by Cardenas and Lopez, who ran up the path toward Ortiz. Lopez had blood on his black and white Raiders jersey; Ortiz did not see a knife on him. Ortiz did not see blood on Cardenas, and she never saw him with a knife. Ortiz continued down the path, and eventually saw Amante and Higuera. Amante was running; Higuera's arm was cut, and he was acting as if he were in pain.

After defendants came up from the creek, they returned to Amante's and Dragoman's apartment. As they were walking back across the bridge, Ortiz and defendants lifted their shirts up toward their heads after Ortiz saw a police car and directed the others to hide their faces. Rebecca and Miguel drove to a

nearby convenience store so that Rebecca could call 911, because it was obvious to her that "something happened."

When the group returned to Amante's apartment, five members of the Norteño gang joined them. Lopez told Amante that "this was for Cinco de Mayo," talked about "eating people," then put on a blue beanie hat with "Sur" written on it that he had not been wearing when he left the apartment. Dragoman testified that Lopez "was kind of like bragging like walking around with a little strut, stuff like that, kind of like a larger than life moment for him or something." Ortiz testified that after Lopez made the remark about Cinco de Mayo, "Pete, he said—I think he said, 'What the fuck are you talking about?' And then Rico [Lopez] said something after that and then everyone just got quiet." Ochoa paced nervously, said he was concerned about police being at the creek, and commented, " 'I don't think that guy was a Scrap.' " Ochoa flushed a black handle from Dragoman's knife set down the toilet. Higuera was on the telephone, had a t-shirt wrapped around his right arm and was applying pressure to it, and appeared to be in a rush to leave. Lopez had blood on his shoes. Ortiz and Dragoman helped wash Lopez's and Ochoa's clothing.

Police found the victim the next morning near a bike path on the north side of the creek. When police found the victim, his pants were pulled down below his waist. He was wearing blue clothing consistent with what Sureño gang members wear. Police found Sureño and Norteño gang graffiti in the area near where Gomez was found. Some Norteño graffiti had been written over Sureño graffiti, a " 'crossout' " that was "a huge form of disrespect in the gang world," according to the prosecution's gang expert. As discussed more fully below, the expert also testified that it was his opinion that defendants were active members of the Norteño street gang at the time of the murder, and that such a murder would be committed for the benefit of the gang because killing a rival gang member would show the gang's power and instill fear of the gang in the community.

On the night of June 28, Detective Leslie Vanderpool returned to the bridge with Miguel, who directed the officer to the apartment where Amante lived. Miguel later identified Amante (in a photographic lineup) as one of the people who stabbed the victim.

Defendants were charged in a first consolidated information with murder (§ 187, subd. (a)—count 1), with a special circumstance that they intentionally killed the victim while they were active participants in a criminal street gang, and that the crime was carried out to further the activities of the gang (§ 190.2, subd. (a)(22)). The information also included an enhancement, alleging that defendants committed the crime for the benefit of a street gang (§ 186.22, subd. (b)(1)).

Amante, 2009 WL 2850354, *1-4 (footnotes omitted)

## II.        STANDARD OF REVIEW

The instant Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under AEDPA, a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding unless:  (1) the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

The first prong of § 2254 applies both to questions of law and to mixed questions of law and fact.  See Williams (Terry) v. Taylor, 529 U.S. 362, 407-409 (2000).  A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks omitted).  "When there is no clearly established federal law on an issue, a state court cannot be said to have unreasonably applied the law as to that issue."  Holley v. Yarborough, 568 F.3d 1091, 1098 (9th Cir. 2009) (citing Carey v. Musladin, 549 U.S. 70, 76-77 (2006)).

Relief under the "unreasonable application" clause is appropriate "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Williams (Terry), 529 U.S. at 411.  Rather, the petitioner must show that the application of Supreme Court law was "objectively unreasonable."  Id. at 409; Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

The second prong of § 2254 applies to decisions based on factual determinations. See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).

In determining whether a state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991); LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). The last reasoned decision in this case is the California Court of Appeal's unpublished disposition issued on September 3, 2009.

## III.   **INSTRUCTIONAL ERROR**

Petitioner alleges three separate claims of instructional error regarding:  (1) aiding and abetting liability (Claim One); (2) voluntary intoxication (Claim Three); and (3) consideration of gang activities (Claim Six).  Pet. at 5-8, 16-18, 27-29.

Claims of error in state jury instructions are generally a matter of state law that do not typically present an issue of constitutional magnitude. Gilmore v. Taylor, 508 U.S. 333, 342-43 (1993).  To obtain federal habeas relief based on instructional error, the

petitioner must demonstrate "that an erroneous instruction so infected the entire trial that the resulting conviction violates due process."  Id.  In making its determination, the Court must evaluate the challenged jury instructions "in the context of the overall charge to the jury as a component of the entire trial process."  Prantil v. Cal., 843 F.2d 314, 317 (9th Cir. 1988) (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where instructional error is shown, the court determines whether there was prejudice; that is, whether the error had substantial and injurious effect or influence in determining the jury's verdict within the meaning of Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  See Pulido v. Chrones, 629 F.3d 1007, 1012 (2010) (citing Fry v. Pliler, 551 U.S. 112 (2007)).

### A.   AIDING AND ABETTING LIABILITY

At trial, defendants were prosecuted for first degree murder under three theories of liability: (1) as actual perpetrators; (2) accomplice liability; and (3) the natural and probable consequences doctrine.  Amante, 2009 WL 2850354, *4.  "Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator."  People v. Prettyman, 14 Cal.4th 248, 259 (1996).  To prove that a defendant is an accomplice, "the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'"  Id. (citation omitted).  "The mental state required for an aider and abettor is the same for all crimes and is independent of the perpetrator's mental state.  The aider and abettor must specifically intend to aid the perpetrator, whether the intended crime itself requires a general or specific intent on the part of the perpetrator."  People v. Mendoza, 18 Cal.4th 1114, 1132 (1998).

Petitioner contends that the trial court erred in failing to adequately instruct the jury on the requirements for a first degree murder conviction based on an aiding and abetting theory of liability.  Pet. at 6-8.  In particular, he contends that the instructions for "straight aiding and abetting" and the "natural and probable consequence doctrine" failed to

differentiate between the different degrees of murder.  Id. at 7.  The Court discusses each

instruction, in turn.

### 1.  Straight Aiding and Abetting Instruction

The prosecution argued that any of the defendants could be convicted for aiding and

abetting in the murder of the victim, even if it was not shown that a particular defendant

was the actual killer.  To that end, the trial court, without objection, gave CALJIC No. 3.00,

as follows:

> Persons who are involved in committing a crime are referred to
> as principles [sic] in that crime. Each principle regardless of the
> extent or manner of participation is ***equally guilty***. Principles
> include, one; those who directly and actively commit the crime,
> commit the act constituting the crime or, two; those who aid
> and abet the commission of the crime. A person aids and abets
> the commission of the crime when he or she, one; with
> knowledge of the unlawful purpose of the perpetrator and two;
> with the intent or purpose of committing or encouraging or
> facilitating the commission of a crime and, three; by act or
> advice, aids, promotes, encourages or instigates the commission
> of the crime.

27 RT 2778 (emphasis added).  Petitioner focuses on the "equally guilty" language,

claiming that it "failed to convey to the jury that an aider and abettor may be guilty of a

lesser crime than the actual perpetrator."  Pet. at 7.

On direct appeal, the state appellate court rejected Petitioner's challenge to the

above-mentioned instruction.  Initially, the court held that Petitioner waived any right to

challenge the instruction by failing to object to it.  Amante, 2009 WL 2850354, *7.  On the

merits, the court disagreed that the "equally guilty" language misled the jury:

> The "equally guilty" language in CALJIC No. 3.00 sets out the
> basic, introductory principle that both actual perpetrators and
> those who merely aid and abet the commission of a crime are
> deemed to be principals under California law. (§ 31.)  This
> language does not state that the actual perpetrator and the one
> who aids and abets the commission of the crime must be found
> guilty of the same offense, nor would a juror reasonably so
> interpret it, especially in light of other instructions given here.
>
> In the present case, the trial court adequately explained the legal
> requirements for being found guilty as an aider and abettor.
> When CALJIC Nos. 3.00 and 3.01 are viewed together with the
> other jury instructions given in this case defining the required
> mental states for the various charged offenses, we are satisfied

that the aiding and abetting instructions meet the intent requirement of McCoy, supra, 25 Cal.4th at p. 1111. These instructions required that the defendant (1) *knew* that the perpetrator intended to commit murder, second degree murder, or voluntary manslaughter and (2) *intended* to aid and abet the perpetrator in the commission of those offenses.

Id., *8 (emphasis in original).  The state appellate court also found that even if the "equally guilty" language could have confused jurors regarding how to evaluate a straight aiding and abetting theory, any such error was harmless beyond a reasonable doubt.  Id. (citing Chapman v. Cal., 386 U.S. 18, 24 (1967)).

In the instant action, Petitioner is not entitled to relief on his claim of instructional error based on the straight aiding and abetting instruction.  As an initial matter, the claim is procedurally defaulted and barred from federal habeas review based on the state appellate court's finding that Petitioner waived his challenge to CALJIC No. 3.00.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (holding a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  Petitioner argues that the state appellate court's finding of waiver does not amount to a procedural bar because California Penal Code § 1259 affords the California Court of Appeal discretion to consider a claim of instructional error, even if no contemporaneous objection was made in the trial court. Traverse at 3-4.[2]  However, Petitioner cites no authority for the proposition that the discretion afforded under this provision necessarily means that a state appellate court's finding of waiver is insufficient constitute a procedural bar to habeas review.  Indeed, the Ninth Circuit has found instructional error claims to be procedurally defaulted where no contemporaneous objection was made at trial.  See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (jury instruction claim procedurally barred by virtue of California Court of Appeal's decision finding that claim waived, where petitioner failed to establish that

---

[2] Penal Code § 1259 states, in relevant part:  The appellate court may . . . review any instruction given, ... even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

California's contemporary objection rule was unclear, inconsistently applied or not well-established).

Procedural bar aside, the instant claim lacks substantive merit.  The California Supreme Court recently rejected the same argument regarding the "equally guilty" language that Petitioner advances in this action.  People v. Bryant, --Cal.4th --, 2014 WL 4197804, *61 (Cal. Supr. Ct. Aug. 25, 2014) (rejecting challenge to the "equally guilty" language and holding that CALJIC 3.00 "stated a correct rule of law.").  That ruling is binding on this Court.  See Wainwright v. Goode, 464 U.S. 78, 84 (1983) ("the views of the state's highest court with respect to state law are binding on the federal courts").  Likewise, the state appellate court's determination on direct appeal that the instruction at issue correctly states the law, and that, in tandem with other instructions given, the jury was properly instructed, is equally controlling.  See Bradshaw v. Richey, 564 U.S. 74, 76 (2005) (per curiam) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); Dixon v. Williams, 750 F.3d 1027, 1033 (9th Cir. 2014) (citing Bradshaw and finding that a state appellate court's finding that an instruction misstated the law was binding in a subsequent federal habeas action); Romero v. California Dept. of Corrections and Rehabilitation, 405 Fed. Appx. 208, 211 (9th Cir. Sept. 3, 2010) ("The California Court of Appeal's conclusion that the instructions were adequate as a matter of state law binds us."); Gonzalez v. Gonzalez, 394 Fed.Appx. 415, 415-16 (9th Cir. Sept. 3, 2010) ("The California Court of Appeal's conclusion that there was no instructional error is a binding interpretation of state law.").  Even if the instruction were flawed, Petitioner has not shown that it was prejudicial under Brecht.  The Court therefore finds that Petitioner is not entitled to habeas relief on his claim based on the straight aiding and abetting instruction.

## 2.  Natural and Probable Consequences Doctrine

Aside from straight aiding and abetting liability, the prosecution argued that jurors could convict any defendant found to have aided and abetted one of five "target crimes" (breach of peace, assault, battery, assault with a deadly weapon, or assault by means of

force likely to produce great bodily injury), and that first degree murder was a natural and probable consequence of the target crime.  Amante, 2009 WL 2850354, *5.  Under the natural and probable consequences doctrine, "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [i.e., target offense] but also of any other crime the perpetrator actually commits [i.e., nontarget offense] that is a natural and probable consequence of the intended crime.  The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable."  Id. at 1133.  "'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. . . . . Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.'"  People v. Chiu, 59 Cal.4th 155, 164 (2014).

Petitioner contends that the trial court's use of CALJIC 3.02, which instructs on the natural and probable consequences doctrine, was erroneous because it does not distinguish between first and second degree murder, and failed to explain how to determine whether the crime committed by the perpetrator was reasonably foreseeable to the others.  Pet. at 8.  The state appellate court rejected this claim, finding that the jury was not, as Petitioner suggests, given an "all or nothing" choice.  Amante, 2009 WL 2850354, *9.  To the contrary, the jury was instructed on the definitions of first degree murder (CALJIC No. 8.20), second degree murder (CALJIC Nos. 8.30, 8.31), and voluntary manslaughter (CALJIC Nos. 8.37, 8.40).  In addition, in response to jury question, the jury was instructed that "[j]ury instruction 3.02 may refer to First Degree Murder, Second Degree Murder or Voluntary Manslaughter, depending upon what you determine the facts to be."  Id.  The court found that the specific reference to crimes "*other than*" First Degree Murder made it

1   clear that the jurors could, in fact, consider lesser offenses under the natural and probable

2   consequences doctrine.  Id.

3         The state appellate court also was unpersuaded by Petitioner's ancillary contention

4   that "[t]he natural and probable consequences doctrine instruction was erroneous in that it

5   failed to correctly explain to the jury how to determine whether the crime committed by the

6   perpetrator was reasonably foreseeable to the petitioner."  Pet. at 8.  In reaching its

7   decision, the court considered the instructions as a whole, and found that they adequately

8   instructed the jury:

> Amante also argues that the trial court failed to instruct jurors
> regarding how to determine which degree of murder was
> foreseeable under the natural and probable consequences
> doctrine.  In fact, the trial court instructed the jury on their duty
> to determine whether any murder conviction was of the first or
> second degree (CALJIC No. 8.70), their obligation to return a
> verdict of second degree murder if they could not unanimously
> agree whether first or second degree murder was committed
> (CALJIC No. 8.71), their obligation to return a verdict of
> manslaughter if they could not unanimously agree whether
> murder or manslaughter was committed (CALJIC No. 8.72),
> their obligation to unanimously agree as to whether a defendant
> was guilty of first degree murder or the lesser offenses of
> second degree murder or voluntary manslaughter (CALJIC No.
> 8.74), and their duty "to determine whether the defendant is
> guilty or not guilty of murder in the first degree *or of any lesser
> crime thereto*" (CALJIC No. 8.75, italics added).

18   Amante, 2009 WL 2850354, *10.

19         The Court finds that Petitioner is not entitled to habeas relief on the basis of any

20   purported error relating to the natural and probable consequences doctrine.  The state

21   appellate court appropriately held that CALJIC 3.02, particularly when considered in

22   tandem with the other instructions given, accurately instructed jurors as to substantive

23   elements of the charged offenses in light of the evidence presented.  As discussed above,

24   the state appellate court's finding that the jury instructions in general, and CALJIC 3.02 in

25   particular, sufficiently instructed the jury is binding on this Court.  See Bradshaw, 564 U.S.

26   at 76; Dixon, 750 F.3d at 1033; Romero, 405 Fed. Appx. at 211; Gonzalez, 394 Fed. Appx.

27   at 415-16.  In any event, even if the instruction on the natural and probable causes doctrine

28   were erroneous, Petitioner has failed to show that such error had a substantially injurious

- 13 -

effect or influence in determining the jury's verdict within the meaning of <u>Brecht</u>. The Court therefore finds that Petitioner is not entitled to habeas relief on his claim based on the natural and probable consequences doctrine instruction.

### 3.     Voluntary Intoxication

Petitioner also contends that the jury instructions regarding voluntary intoxication were inadequate on the ground that they did not instruct that intoxication could be considered under the natural and probable consequences doctrine. Pet. at 17-18.  In particular, he alleges that "it was not explained to the jury that they could consider evidence of intoxication in determining whether petitioner had the specific intent to aid the perpetrator in committing any of the specified target offenses." <u>Id.</u>  He further claims that the prosecutor "exacerbated" this alleged error by misstating the relevance of intoxication evidence during his closing argument.[3]

On direct appeal, the state court of appeal rejected Petitioner's claim of error, finding that the jury instructions correctly explained how intoxication relates to intent and that the prosecutor did not misstate the law.  The court explained as follows:

> Jurors were instructed that in order to find defendants guilty under the natural and probable consequences doctrine, they first had to find beyond a reasonable doubt that one of five target crimes (defined as general intent crimes for which intoxication was not a defense) was committed. They were instructed that they next had to find that defendant aided and abetted one of those (general intent) target crimes. *Jurors were elsewhere instructed that they could consider evidence of voluntary intoxication in determining whether a defendant tried as an aider and abettor had the required mental state (i.e., that he acted with the intent or purpose of committing or encouraging or facilitating the commission of the crime). In other words, although jurors were told that intoxication was not a defense to the target crimes themselves, they were correctly informed that intoxication was a potential defense to aiding and abetting one of those crimes, consistent with <u>Mendoza</u>, supra, 18 Cal.4th 1114.*  In sum, we disagree with Amante's argument that greater care was needed to ensure that the jury understood that

---

[3] Petitioner took issue with the prosecutor's statement that:  "If the murder was a natural and probable consequence [] of one of those five target crimes, and you find that Pete Amante aided and abetted in one of those five target crimes which are general intent crimes, not specific intent crimes, then it doesn't matter that he was drunk."

1    intoxication applied to the natural and probable consequences
2    doctrine.

3  Amante, 2009 WL 285.354, *18 (emphasis added).  The state court of appeal also found no

4  error in the prosecutor's closing argument.

5        The state court of appeal's determination that the jury instructions and prosecutor's

6  argument correctly stated California law is controlling on habeas review.  See Bradshaw,

7  546 U.S. at 76; Dixon, 750 F.3d at 1033; Romero, 405 Fed. Appx. at 211; Gonzalez, 394

8  Fed. Appx. at 415-16.  Nor has Petitioner demonstrated error under Brecht.   Accordingly,

9  Petitioner's claim of instructional error must fail.

10       **B.    CONSIDERATION OF GANG ACTIVITIES**

11       Petitioner complains that the trial court's use of a modified version of CALJIC No.

12  2.05 resulted in an unfair trial.  The instruction at issue reads as follows:

13       Evidence has been introduced for the purpose of showing
         criminal street gang activities, and of criminal acts by gang
14       members, other than crimes for which defendants are on trial.
         [¶]  Except as you will otherwise be instructed, this evidence, if
15       believed, may not be considered by you to prove that any
         defendant is a person of bad character or that he has had a
16       disposition to commit crimes. *It may be considered by you only
         for the limited purpose of determining that if it intends to show*:
17       [¶] The existence of intent which is a necessary element of the
         crime charged; [¶] A motive for the commission of the crime
18       charged; [¶]  The defendant had knowledge or possessed the
         means that might have been useful or necessary for the
19       commission of the crime charged; [¶]  That the crime or crimes
         charged were committed for the benefit of, at the direction of,
20       or in association with a criminal street gang, with the specific
         intent to promote, further, or assist in any criminal street gang,
21       with the specific intent to promote, further, or assist in any
         criminal conduct by gang members.  [¶]  For the limited
22       purpose for which you may consider such evidence, you must
         weigh it in the same manner as you do all other evidence in the
23       case.  You are not permitted to consider such evidence for any
         other purpose.

24
25  27 RT 6772-6773.

26       Petitioner asserts that the above instruction erroneously allowed the jury to consider

27  evidence of all other Norteño gang activities, even if committed by other gang members, in

28  determining Petitioner's intent and motive, whether he had the means to commit the

1  murder, and whether the gang allegations were true.  Pet. at 28.  He also claims that the

2  instruction allowed the jury to consider hearsay for the truth of the matter asserted in

3  violation of the Confrontation Clause.  Id.

4         On direct appeal, the state appellate court rejected Petitioner's claim of instructional

5  error on procedural and substantive grounds.  The court noted that Petitioner waived the

6  issue by failing to object to CALJIC No 2.50, as modified, and failing to request a

7  clarifying instruction at trial.  On the merits, the court rejected the suggestion that the

8  instruction permitted the jury to consider evidence for any impermissible purposes.  The

9  court explained:

10         Defendants argue that the trial court "committed serious error in
       giving a combined version of CALJIC No. 2.50 that permitted

11         jurors to consider all gang evidence on all conceivable issues in
       the case, not just gang enhancement issues, denying

12         [defendants] due process of law, a fair trial, and [their] Sixth
       Amendment right to confront testimonial hearsay relied upon

13         by the gang expert."  This argument is not supported by a
       review of the instruction given to the jury, which provided that

14         jurors were to consider gang evidence, not for "all conceivable
       issues," but "*only* for the *limited purpose*" of determining

15         whether it tended to show intent, motive, knowledge of means
       useful for commission of the crime, and whether the crimes

16         charged were committed for the benefit of a street gang. (Italics
       added.) The instruction was consistent with [People v.

17         Hernandez, 33 Cal.4th 1040 (2004)] and did not misstate the
       purposes for which the jury could consider gang evidence.

18

19  Amante, 2009 WL 2850354, *27.[4]

20         The Court finds that the state appellate court's rejection of Petitioner's claim

21  regarding CALJIC No. 2.50 was not objectively reasonable.  As an initial matter, the claim

22  is procedurally barred based on Petitioner's failure to object at trial.  See Coleman, 501

23  U.S. at 729-30.  Even if the instruction impermissibly allowed the jury to consider gang

24  evidence for inappropriate purposes, such a claim is not cognizable.  "Under AEDPA, even

25

26         [4] In Hernandez, the California Supreme Court held that "[e]vidence of the
    defendant's gang affiliation—including evidence of the gang's territory, membership,

27  signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help
prove identity, motive, modus operandi, specific intent, means of applying force or fear, or

28  other issues pertinent to guilt of the charged crime."   33 Cal.4th at 1049

clearly erroneous admissions of evidence that render a trial fundamentally unfair may not

permit the grant of federal habeas corpus relief if not forbidden by 'clearly established

federal law,' as laid out by the Supreme Court." <u>Holley</u>, 568 F.3d at 1101.  The Supreme

Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

evidence constitutes a due process violation sufficient to warrant issuance of the writ." <u>Id.</u>

Thus, any error in the admission of gang evidence at trial resulting from the allegedly

erroneous instruction would not entitle Petitioner to habeas relief, since there is no clearly

established Supreme Court law for the state appellate court to contravene.  <u>See id.</u>; <u>accord</u>

<u>Pena v. Tilton</u>, — Fed. Appx. —, 2014 WL 2611147, *1 (9th Cir. June 12, 2014) (rejecting

habeas petitioner's due process claim based on the allegedly erroneous admission of gang

evidence on the ground that the Supreme Court has never issued a "clear ruling that

admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

sufficient to warrant issuance of the writ.") (citing <u>Holley</u>, 568 F.3d at 1101); <u>Nieto v.</u>

<u>Lamarque</u>, 410 Fed. Appx. 37, 2010 WL 5605874, *2 (9th Cir. Dec. 7, 2010) (refusing to

issue a certificate of appealability because "[t]here was no clearly established Supreme

Court law that even repeated references to a defendant's gang affiliation can render his trial

fundamentally unfair"); <u>see also</u> <u>Briceno v. Scribner</u>, 555 F.3d 1069, 1077-78 (9th Cir.

2009) (holding that the petitioner's claim of denial of due process and a fair trial based on

the admission of a gang expert's testimony that crimes in question were gang-related did

not contravene federal law), <u>overruled on other grounds by</u> <u>Emery v. Clark</u>, 643 F.3d 1210,

1215 (9th Cir. 2011).

     The state appellate court's decision upholding the trial court's use of CALJIC No.

2.05, as modified, also was not objectively unreasonable.  Petitioner contends that the

limiting instruction failed to expressly advise the jury that evidence of Norteños' violent

activities was not proof that Petitioner was guilty of murder or that the killing was

committed in association with or for the benefit of the gang.  Pet. at 29.  As the state

appellate court pointed out, however, the instruction specifically informed the jury as to the

"only" purposes for which it could consider gang evidence.  <u>Amante</u>, 2009 WL 2850354,

*28.  Federal courts must presume that juries follow the instructions given to them, and there is no showing to the contrary.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000). That aside, the state appellate court's finding that there was no need for more specific limiting instructions given that the jury was properly instructed on the requirements for a first degree murder conviction is reasonable and controlling.  E.g., Romero, 405 Fed. Appx. at 211.

Petitioner also claims that the trial court erred in failing to give a limiting instruction that the jury could not consider any hearsay statements relied upon by the prosecution's experts for the truth of the matter asserted.  The state appellate court found that this claim was waived by virtue of Petitioner's failure to request such an instruction and that, under California law, the trial court had no duty to sua sponte give such instruction.  Amante, 2009 WL 2850354, *28.  As such, this claim is procedurally defaulted for purposes of federal habeas review.  See Coleman, 501 U.S. at 729-30.  The state appellate court also reasonably found that other instructions given to the jury adequately instructed them on the limited purposes for which the gang evidence could be considered.  E.g., Romero, 405 Fed. Appx. at 211.

Finally, the Court finds nothing objectively unreasonable in the state appellate court's alternative finding that Petitioner claim of error failed on the merits because "no specific hearsay evidence relied on by the gang expert that might have been considered for an improper purpose, much less demonstrate how he was prejudiced by the absence of a limiting instruction, . . ."  Amante, 2009 WL 2850354, *29.  Thus, even if the instruction were erroneous, Petitioner has failed to show that it had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637. For all these reasons, the Court finds no merit to Petitioner's claim that the trial court's natural and probable causes instruction entitles him to habeas relief.

1  **IV.    SUFFICIENCY OF THE EVIDENCE**

2        Petitioner challenges the sufficiency of the evidence with respect to: (1) his

3  conviction for first degree murder (Claim Two); (2) the gang enhancement and special

4  circumstance (Claim Four).

5        "Insufficient evidence claims are reviewed by looking at the elements of the offense

6  under state law." Emery v. Clark, 643 F.3d 1210, 1214 (9th Cir. 2011) (per curiam).

7  "[T]he relevant question" in a sufficiency of the evidence claim "is whether, after viewing

8  the evidence in the light most favorable to the prosecution, any rational trier of fact could

9  have found the essential elements of the crime beyond a reasonable doubt." Jackson v.

10 Virginia, 443 U.S. 307, 319 (1979).  Habeas claims predicated upon the alleged

11 insufficiency of evidence "face a high bar in federal habeas proceedings because they are

12 subject to two layers of judicial deference." Coleman v. Johnson, – U.S. –––, –––, 132 S.Ct.

13 2060, 2062 (2012) (per curiam).  The Coleman court stated:

14              First, on direct appeal, "it is the responsibility of the jury—not
               the court—to decide what conclusions should be drawn from
15              evidence admitted at trial.  *A reviewing court may set aside the
               jury's verdict on the ground of insufficient evidence only if no
16              rational trier of fact could have agreed with the jury*." . . . .
               And second, on habeas review, "a federal court may not
17              overturn a state court decision rejecting a sufficiency of the
               evidence challenge simply because the federal court disagrees
18              with the state court.  The federal court instead may do so only if
               the state court decision was 'objectively unreasonable.'"

19

20 Id. (citations omitted); Emery, 643 F.3d at 1213-14 ("When we undertake collateral review

21 of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28

22 U.S.C. § 2254(d)(1), however, our inquiry is even more limited; that is, we ask only

23 whether the state court's decision was contrary to or reflected an unreasonable application

24 of Jackson to the facts of a particular case.") (citing Juan H. v. Allen, 408 F.3d 1262, 1274-

25 75 (9th Cir. 2005)).

26      **A.    FIRST DEGREE MURDER CONVICTION**

27        Petitioner alleges that there was insufficient evidence that he personally stabbed the

28 victim or he aided and abetted in the murder.  Pet. at 9-15.  The state court of appeal

rejected Petitioner's challenge to the sufficiency of the evidence.  <u>Amante</u>, 2009 WL 2850354, *12-16.  First, the court held that sufficient evidence was presented to show that Petitioner was an actual perpetrator.  <u>Id.</u>, *12.  Although the evidence may not have conclusively established that each defendant stabbed Gomez, the court noted that there was testimony that Petitioner and his co-defendants participated in the attack.  In addition, Petitioner was specifically identified in a photo lineup as was one of the perpetrators who stabbed the victim.  <u>Id.</u>, *12.

Second, the state court of appeal found that sufficient evidence was presented to support Petitioner's conviction under a straight aiding and abetting theory.  Under an aiding and abetting theory of liability, the prosecution must prove that the defendant "acted with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, encouraging, or facilitating commission of the target offense."  <u>In re Meagan R.</u>, 42 Cal.App.4th 17, 22 (1996) (citing <u>People v. Beeman</u>, 35 Cal.3d 547, 556 (1984)).  Here, the court noted that the evidence showed that Petitioner—who armed himself with a large butcher knife before leaving his apartment—ran to join his fellow Norteño gang members in response to hearing what they believed to be Sureño whistles coming from a nearby creek.  <u>Amante</u>, 2009 WL 2850354, *13.  The evidence also shows that the group participated in in an unprovoked attack in which the victim was stabbed up to forty times.  <u>Id.</u>  Based on this record, the Court finds that it was objectively reasonable for the state appellate court to conclude that "there was sufficient evidence to show (under an aiding and abetting theory) that Amante had knowledge of the killer's or killers' unlawful purpose, and that he had the intent to encourage or bring about the target offense of murder."  <u>Id.</u>, *14.

Finally, the state appellate court properly found that sufficient evidence was presented to support a conviction under the natural and probable causes doctrine.  <u>Amante</u>, 2009 WL 2850354, *15-16.  Petitioner contends that the evidence presented failed to prove that non-target crime of premeditated murder was the natural and probable consequence of any of the target crimes (i.e., breach of peace, assault, battery, assault with a deadly weapon, or assault by means of force likely to produce great bodily injury).  Pet. at 14;

Traverse at 11-12.  According to Petitioner, the killing resulted from an impulsive reaction to hearing a rival gang whistle, as opposed to any "preconceived or coordinated plan to kill."  Id. at 12.  The state appellate court, however, found that Petitioner's argument mischaracterizes the record and that "[t]he more reasonable inference, supported by the jury's verdict, is that [he] (as well as other defendants) aided and abetted in any one of the five target offenses, and that murder was the natural and probable consequence of the attack."  Amante, 2009 WL 2850354, *15.

The Court finds that state appellate court's decision was not objectively unreasonable.  See Coleman, 132 S.Ct. at 2062; Emery, 643 F.3d at 1213-14.  There was ample evidence presented at trial showing that Petitioner and his co-defendants killed Gomez in a group attack.  The attack was vicious, with Gomez suffering at least forty stab wounds, including cuts to the head, chest, and back.  There is no evidence that Gomez had done anything to threaten Petitioner or provoke the attack.  In addition, there was evidence of planning, including the fact that after hearing what they believed to be an enemy gang's whistle, Petitioner and his associates armed themselves with knives from Petitioner's kitchen before leaving the apartment to confront their perceived rival.  In sum, the California Court of Appeal reasonably applied controlling law and found substantial evidence supported the jury's verdict of first degree murder.

### B.   GANG ENHANCEMENTS AND SPECIAL CIRCUMSTANCE

#### 1.   Penal Code § 186.22(b)

Petitioner contends that there was insufficient evidence to support a gang enhancement under Penal Code § 186.22(b), which requires the prosecution to prove two separate and distinct elements beyond a reasonable doubt:  (1) that the defendant committed a felony "for the benefit of, at the direction of, or in association with [a] criminal street gang"; and (2) that the defendant committed the crime "with the specific intent to promote, further, or assist" in criminal conduct by gang members.  Cal. Pen. Code § 186.22(b)(1).  Petitioner contends that the prosecution's evidence of intent, in particular, was insufficient

1    because it was based on the hypothetical testimony of the prosecution's gang expert.  Pet. at

2    22.

3         The state appellate court considered and rejected Petitioner's claims regarding the

4    § 186.22(b) enhancement.  The court noted that Robert Scott, a Santa Rosa police officer

5    with training and experience in gangs—including the Norteño street gang in Sonoma

6    County—provided extensive, probative testimony showing that Petitioner's conduct in

7    attacking a Sureño gang member was a means of gaining respect and enhances the

8    reputation of the gang.  Under state law, such testimony is sufficient to establish that a

9    defendant committed the offense with the specific intent to promote, further or assist in the

10   criminal conduct of gang members.  See People v. Albillar, 51 Cal.4th 47, 63 (2010)

11   ("Expert opinion that particular criminal conduct benefited a gang by enhancing its

12   reputation . . . can be sufficient to raise the inference that the conduct was 'committed for

13   the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)");

14   accord People v. Xue Vang, 52 Cal.4th 1038, 1048 (2011) ("'Expert opinion that particular

15   criminal conduct benefited a gang' is not only permissible but can be sufficient to support

16   the Penal Code section 186.22, subdivision (b)(1), gang enhancement.") (citation omitted).

17        Citing Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009), Petitioner argues

18   that hypothetical expert testimony such as that offered at trial has been found by the Ninth

19   Circuit to be insufficient to support a gang enhancement under Penal Code § 186.22(b)(1).

20   Pet. at 21.  In Albillar, the California Supreme Court expressly rejected Briceno's

21   conclusion that expert testimony is insufficient to support the enhancement at issue.

22   Albillar, 51 Cal.4th at 68.  The Ninth Circuit has since found that "Albillar is binding on

23   this court in federal habeas cases," on the ground that a state court's interpretation of state

24   law binds a federal court sitting in habeas corpus.  Bonilla v. Adams, 423 Fed.Appx. 738,

25   739-740, 2011 WL 1058181, *1 (9th Cir. Mar. 21, 2011) ("The Albillar court's

26   determination that the evidence in that case satisfied the specific intent element of a gang

27   enhancement finding compels us to conclude that the district court did not err in

28   determining that Bonilla was not entitled to relief on the ground of insufficiency of the

evidence.").  The Court thus rejects Petitioner's claim that insufficient evidence supported an enhancement under § 186.22(b).  See Coleman, 132 S.Ct. at 2062; Emery, 643 F.3d at 1213-14.

## 2.      Penal Code § 190.2(a)(22)

Petitioner next contends that there was insufficient evidence to support a special circumstance finding based on him being an active gang member at the time of the killing, which was carried out to further the activities of the gang.  Pet. at 19.  He argues that the evidence of his gang membership was stale because the evidence of his gang related conduct occurred a year prior to the killing.  In addition, Petitioner claims that he was in the process of withdrawing from the gang.  Id.

The state court of appeal rejected Petitioner's contention that there was insufficient evidence that he was an active gang member at the time of the murder.  Amante, 2009 WL 2850354, *21.  The court pointed out that evidence was presented showing that Petitioner had gang tattoos, was photographed with other Norteños holding a red bandana (red being a Norteño color), had numerous prior contacts with gang enforcement team officers while wearing clothing associated with the Norteño gang, and associated with known Norteño gang members.  In addition, Petitioner was observed "throwing up gang hand signs," and was seen at a party where thirty Norteños were present just weeks prior to the murder.  Id. The court noted that while there was evidence that Petitioner was attempting to withdraw from the gang, which included removing his gang tattoos, Santa Rosa police officer Rainer Navarro testified that Petitioner was continuing to wear gang colors and clothing and associate with other Norteños.  The state court of appeal concluded that "[g]iven all the evidence about Amante's gang activity, there was substantial evidence that Amante was an active gang member on the date of the murder" for purposes of § 190.2(a)(22).  Id., *22. Such finding is consistent with California law.  People v. Carr, 190 Cal.App.4th 475, 489 (2010) ("a jury may rely on evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits, to make findings concerning a defendant's active participation in a gang or a pattern of gang activity[.]").  Given the substantial

1  evidence presented regarding Petitioner's gang membership, the Court finds that the state

2  appellate court's conclusion that sufficient was presented to support a finding under

3  § 190.2(a)(22) was not objectively unreasonable.  See Coleman, 132 S.Ct. at 2062; Emery,

4  643 F.3d at 1213-14.

5  **V.   EVIDENTIARY ERRORS**

6      Petitioner raises two claims in which he contends that his constitutional rights were

7  violated based on the trial court's evidentiary rulings.  He contends that the trial court erred in

8  (1) permitting a gang expert to offer testimony regarding motive (Claim Five); and

9  (2) admitting evidence that Miguel identified Petitioner in an allegedly unduly suggestive

10  photo lineup (Claim Eight).

11      **A.   ADMISSION OF EXPERT TESTIMONY**

12      Petitioner alleges that his due process right to a fair trial was violated by the

13  admission of expert opinion testimony that the killing was committed for the benefit of or

14  in association with a criminal street gang.  Pet. at 24-25.  He argues that the gang expert's

15  opinion in response to hypothetical questions regarding Petitioner's knowledge and intent

16  invaded the province of the jury.  Id.   Such testimony, Petitioner claims, "was highly

17  prejudicial with respect to both the murder charge and gang allegations."  Traverse at 17.

18      Petitioner cannot establish that the state appellate court's decision is contrary to or is

19  an unreasonable application of clearly established Supreme Court law.  See Briceno, 555

20  F.3d at 1077-78 (rejecting habeas claim that expert testimony regarding gang-related nature

21  of crimes unconstitutionally pertained to ultimate issue for jury, because "there is no clearly

22  established constitutional right to be free of an expert opinion on an ultimate issue").

23  Moreover, the Ninth Circuit has consistently held that allowing an expert to provide gang-

24  related testimony does not offend due process.   Moses v. Payne, 555 F.3d 742, 761 (9th

25  Cir. 2009) (rejecting the suggestion that "the Constitution is violated by the admission of

26  expert testimony concerning an ultimate issue to be resolved by the trier of fact.");

27  Windham v. Merkle, 163 F.3d 1092, 1103-104 (9th Cir. 1998) (finding no due process

28  violation in admission of "gang expert" testimony which was relevant to prosecution theory

of petitioner's motive for presence and participation in crimes which led to murder by

accomplice).[5]  On this basis alone, Petitioner's due process claim fails, as a matter of law.

### B.  SUGGESTIVE LINE-UP

#### 1.  Background

Eyewitness Miguel was shown two photo lineups.  The first lineup took place two

days after the murder and consisted of seven "six-pack" photographic lineups, or a total of

forty-two photographs of individuals.  The lineups consisted of color as well as black and

white 2" x 3" photos, including color photographs of Amante and Higuera and a black-and-

white photograph of Ochoa.  Miguel did not identify anyone shown in the lineup.  Later

that night, Miguel and Detective Leslie Vanderpool, who was not involved in the first photo

lineup, went to the crime scene.  Miguel indicated that one of the perpetrators may live in a

nearby apartment complex.

After returning from the crime scene, Miguel was shown a lineup of four large color

photographs of men with mustaches, which included Petitioner, Higeura and two others.

The same photos of Petitioner, Higuera and two other suspects were shown in the prior

lineup, except that larger (approximately 4" x 5") versions were used in the second lineup.

Vanderpool admonished Miguel that the individual he had previously described to him may

not be in the photographs.  However, Miguel almost immediately pointed to Petitioner's

photograph and identified him as the person who lived in the apartment complex.

Petitioner moved to suppress Miguel's identification of Petitioner in the second

photo lineup.  The trial court held an evidentiary hearing in connection with the motion.

Petitioner presented an witness identification expert, who opined that showing a witness the

same photograph twice within a relatively short period of time may trigger a faulty

recognition of a suspect, and identifying a person from a distance of 300 feet would be

---

[5] Likewise, under state law, the fact that an expert's testimony may have touch upon an ultimate issue in the case, including defendant's motive, do not violate due process.  See People v. Valdez, 58 Cal. App. 4th 494, 508-509 (1997) (finding trial court properly admitted expert witness' opinion that individual participants in gang-related shooting acted for the benefit of a gang).

difficult.  The trial court denied the motion to suppress and ruled that Miguel's

identification of Petitioner was admissible.

On appeal, Petitioner argued that it was reversible error to admit evidence of

Miguel's out-of-court identification of him.  The state appellate court found that Petitioner

had not met his burden of proving that the identification procedure was unreliable.  The

court explained:

> Although Miguel previously had been unable to identify
> Amante in a lineup with a different detective, it makes sense
> that Vanderpool would show Miguel an additional photographic
> lineup after Miguel had provided detailed information about a
> specific suspect following a visit to the scene of the crime. It is
> not as if police simply showed Miguel photographs of Amante
> in successive lineups until Miguel was able to identify Amante,
> a procedure that might be considered unfair because it "suggests
> in advance of identification by the witness the identity of the
> person suspected by the police." (People v. Slutts (1968) 259
> Cal.App.2d 886, 891 [photographic lineup violated due process
> where child shown several pictures, but only one had beard
> drawn on it].)  As respondent notes, had the first lineup
> influenced Miguel's second review of photographs, "one would
> have expected Miguel to recognize all four photos because they
> had all been included in the earlier review."
>
> ***
>
> Even assuming arguendo that the identification procedure was
> impermissibly suggestive so as to lead to a substantial
> likelihood of misidentification, we conclude that the procedure
> was reliable under the totality of the circumstances. (Manson v.
> Brathwaite, [432 U.S. 98, 114 (1977)]; People v. Ochoa, [19
> Cal.4th 353, 412 (1998].) When asked whether he was able to
> see down the bike path to where the assault occurred, Miguel
> testified, "Yes. Not perfectly, but I can see the people right
> there." Miguel was shown a photograph of Amante just two
> days after the murder. Most significantly, Vanderpool testified
> that Miguel "had no trouble whatsoever identifying th[e]
> photograph of Mr. Amante" as being the person who lived in
> Amante's apartment and whom he saw the night of the murder.
> We conclude that the trial court did not err in admitting
> evidence of the photographic lineups.

Amante, 2009 WL 2850354, *34.

### 2.     Analysis

A pretrial identification procedure violates due process if the procedure is "so

impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968).  The

constitutionality of identification procedures involves a two-part analysis.  First, the court must determine whether the identification procedure was impermissibly suggestive and conducive to misidentification.  Even if the procedure was impermissibly suggestive, an identification procedure that is nonetheless reliable under the totality of the circumstances can be admitted without violating due process.  Neil v. Biggers, 409 U.S. 188, 199-200 (1972)[6]; see also Manson, 432 U.S. at 106.  As indicated above, this is the same two-part test employed by the state appellate court.  Amante, 2009 WL 2850354, *34.

Petitioner alleges that using the same photograph of Petitioner in both lineups impermissibly suggestive.  Although Petitioner fails to cite any relevant authority, the Court notes that using "a suspect's image in successive lineups might be suggestive if the same photograph were reused or if the lineups followed each other quickly enough for the witness to retain a distinct memory of the prior lineup."  People v. Yeoman, 31 Cal.4th 93, 124 (2003).  At the same time, there is no brightline rule that prohibits law enforcement officials from "[a] further attempt to elicit a positive identification of a particular suspect from an eyewitness who does not identify the suspect from the first photograph . . . ."  Id. at 125.  Here, the state appellate court found that it "ma[de] sense" to show Miguel a second photo lineup after visiting the crime scene.  Amante, 2009 WL 2850354, *34.  However, the issue is not whether a second lineup was justified, but whether the use of the same photo in a lineup occurring a later the same day is impermissibly suggestive.

The above notwithstanding, the Court finds nothing objectively unreasonable regarding that the state appellate court's ultimate conclusion that the lineup procedure was neither unduly suggestive nor unreliable.  As that court logically noted, "had the first lineup influenced Miguel's second review of photographs, one would have expected Miguel to recognize all four photos because they had all been included in the earlier review."  Id., *34

---

[6] These factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  Id. at 199-200.

1   (internal quotations omitted).  Moreover, the Court agrees that the totality of the

2   circumstances support the conclusion that the identification was reliable.  See Neil, 409

3   U.S. at 199-200.  Miguel identified Petitioner from the lineup only two days after the

4   incident, and testified that he was able to see the people down the path where the attack

5   transpired.  Vanderpool testified that Miguel had "no trouble whatsoever" in immediately

6   identifying Petitioner in as the person who lived in the nearby apartment building and

7   whom he saw on the evening of the murder.  Id., *35.

8       Even if the admission of Miguel's identification of Petitioner were erroneous, such

9   error was harmless.  See United States v. Carr, 761 F.3d 1068, __  (9th Cir. 2014) ("even if

10  the pretrial identification procedure was suggestive and the identification was unreliable,

11  this court must examine the district court's failure to exclude the identification for harmless

12  error.") (citing Ocampo v. Vail, 649 F.3d 1098, 1114 (9th Cir. 2011)).  Petitioner contends

13  that "Miguel's photographic identification was the only evidence suggesting that [he] was

14  the person who actually stabbed Gomez."  Traverse at 24.  That ignores, however, that

15  there was substantial evidence to sustain Petitioner's murder conviction on alternative

16  theories of straight aiding and abetting or the natural and probable consequences doctrine.

17  Thus, to the extent that trial court erroneously admitted evidence regarding Miguel's

18  identification, Petitioner has not shown that such alleged error had a substantial and

19  injurious on the jury's verdict.  See Brecht, 507 U.S. at 637. Petitioner is not entitled to

20  habeas relief on this claim.

21  **VI.    FAILURE TO BIFURCATE**

22      In Claim Seven, Petitioner contends that his right to due process was violated by

23  virtue of the trial court's refusal to bifurcate the trial of the gang enhancement and special

24  circumstance.  Pet. at 30.  As a result of such refusal, Petitioner claims that the jury was

25  allowed to consider "highly prejudicial" gang evidence that was unrelated to the murder

26  charge.  Id.

27      The improper joinder of charges does not violate the Constitution unless the

28  prejudice is so great as to deprive a defendant of a fair trial under the Fifth Amendment.

United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  Prejudice may be shown where the joinder of charges serves to inflame the jury, where a stronger case on one count is used to bolster a weaker case on another count, or where evidence of the joined counts would not be cross-admissible in separate trials.  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

On direct appeal, the state appellate court held that the trial court properly exercised its discretion in denying Petitioner's request to bifurcate:

> The party seeking severance or bifurcation has the burden to "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (People v. Bean (1988) 46 Cal.3d 919, 938.)  No such substantial danger of prejudice was shown here. We agree with the trial court that the gang charges were "so intertwined with the underlying substantive offense" that it would have been all but impossible to bifurcate the trial. Witnesses established that defendants were motivated to target "Scraps" after hearing what they believed to be Sureño whistles coming from an area that was the subject of rival claims by the Norteños and Sureños.  Gang rivalry was the only motive offered for the murder; a bifurcated trial therefore would have been impracticable.

Amante, 2009 WL 2850354, *31.

As an initial matter, Petitioner's claim that the failure to bifurcate resulted in the admission of prejudicial evidence is not cognizable in a habeas action.  E.g., Holley, 568 F.3d at 1101 (a claim based on the admission of allegedly prejudicial evidence does not present a violation of clearly established federal law as required for habeas relief under AEDPA); Pena v. Tilton, — Fed. Appx. —, 2014 WL 2611147, *1 (rejecting habeas due process claim based on the allegedly erroneous admission of gang evidence).   Nor does the Court find the state appellate court's decision objectively unreasonable.  The evidence showed—and Petitioner's concedes—that the impetus of the attack was the violent and acrimonious relationship involving Norteños and Sureños, and Petitioner and his co-defendants having heard what they believed to be a whistle associated with Sureños.  Thus, evidence of Petitioner's gang membership and how gangs operate was admissible to establish the motive for the shooting—which would have been an issue even had the trial been bifurcated—and did not impinge on Petitioner's right to a fair trial.  See Windham,

163 F.3d at 1103-104 (finding admission of gang evidence did not violate due process where evidence was relevant to motive).  Petitioner is not entitled to habeas relief based on the trial court's failure to bifurcate.

## VII.   DENIAL OF MOTION TO SEVER

### A.   BACKGROUND

In Claim Eight, Petitioner claims that the trial court improperly refused to sever him from his co-defendants based on a statement he gave to the police following his arrest.  In that statement, Petitioner acknowledged his presence at the crime scene and provided details regarding the killing.  Amante, 2009 WL 2850354, *32.  Petitioner moved to sever on the grounds that his defenses would conflict with or be antagonistic to his co-defendants and that the statement would violate their Sixth Amendment rights.  Id.  The prosecution agreed to redact the statement to eliminate the possibility of antagonistic defenses, and the trial court denied the motion to sever.

Petitioner renewed his motion to sever, arguing that the redactions resulted in the omission of evidence favorable to him.  The trial court declined to sever the trial, but granted Petitioner's alterative request to seat two juries.  The prosecution then indicated that it no longer intended to present the statement at trial and therefore two separate juries were unnecessary.  The trial court agreed and the statement was not admitted.  At trial, however, Ortiz (Petitioner's cousin) testified on cross-examination that that Petitioner told her and Dragoman (Petitioner's fiancée) that they should give a statement to the police, and that he had already done so.  Petitioner then renewed his motion to sever, claiming that the reference to his statement put him at a tactical disadvantage.  The trial court denied the motion.

On direct appeal, the state appellate court rejected Petitioner's contention that the denial of the motion to sever amounted to reversible error.  The court explained that although there was mention of the statement to the police, Petitioner's incriminating statement was not admitted into evidence.  Alternatively, the court found that there was "no

1  reasonable probability that Amante would have received a more favorable result in such a

2  trial."  Amante, 2009 WL 2850354, *32-33.

3      **B.   ANALYSIS**

4      Citing Zafiro v. United States, 506 U.S. 534, 538 (1993), Petitioner contends that

5  "[t]he Court of Appeal's decision that petitioner's trial was not rendered 'fundamentally

6  unfair' by the trial court's refusal to sever petitioner's trial was unreasonable and contrary

7  to clearly established Supreme Court law."  Traverse at 21.  The Ninth Circuit has held,

8  however, that "there is no clearly established federal law requiring severance of criminal

9  trials in state court even when the defendants assert mutually antagonistic defenses . . . ."

10  Runningeagle v. Ryan, 686 F.3d 758, 774 (9th Cir. 2012); Collins v. Runnels, 603 F.3d

11  1127, 1132 (9th Cir. 2010) ("neither Zafiro v. United States nor United States v. Lane

12  establish a constitutional standard binding on the states requiring severance in cases where

13  defendants present mutually antagonistic defenses.").   In any event, the Court concurs with

14  the state appellate court that there was no error or prejudice resulting from the denial of

15  Petitioner's motion to sever.

16      Petitioner contends that the other defense counsel, in their cross-examination of

17  Ortiz, suggested that Petitioner had coached her and Dragoman to give the police an

18  account of what had transpired that was favorable to him.  Traverse at 22.  Petitioner also

19  contends that defense counsel claimed during closing argument that Petitioner was the

20  person who stabbed the victim.  Id.  However, severance is not required simply because one

21  defendant points the finger at the other.  United States v. Hernandez-Orellana, 539 F.3d

22  994, 1002 (9th Cir. 2008).  In order to prevail on an antagonistic defense theory, the

23  defendant must show that the core of his co-defendant's defense "is so irreconcilable with

24  the core of his own defense that the acceptance of the co-defendant's theory by the jury

25  precludes acquittal of the defendant."  Id. (citation omitted); United States v. Tootick, 952

26  F.2d 1078, 1081 (9th Cir. 1991) (holding that defenses are mutually exclusive when

27  "acquittal of one codefendant would necessarily call for the conviction of the other.").

28  Here, even if the jury believed that Petitioner was the actual killer, such a finding would not

1  absolve the co-defendants of liability as aiders and abettors.  See People v. McCoy, 25

2  Cal.4th 1111, 1120 (2001) ("The aider and abettor doctrine merely makes aiders and

3  abettors liable for their accomplices' actions as well as their own.  It obviates the necessity

4  to decide who was the aider and abettor and who the direct perpetrator or to what extent

5  each played which role.").  Moreover, Petitioner makes no showing that such evidence

6  would not have been admissible in a separate trial.  Nor has he shown that the outcome

7  would have been different had the trials been severed.  See Davis v. Woodford, 384 F.3d

8  628, 638 (9th Cir. 2004) ("The requisite level of prejudice is reached only if the

9  impermissible joinder had a substantial and injurious effect or influence in determining the

10  jury's verdict.").  Petitioner is not entitled to relief on his failure to sever claim.

11  **VIII.  JUROR BIAS AND MISCONDUCT CLAIMS[7]**

12       Petitioner claims that his rights to due process and an impartial jury were violated as

13  a result of the trial court's refusal to discharge an alternate juror ("alternate"), identified as

14  Juror 1499, based on her alleged relationship with co-defendant's Ochoa's father and sister

15  (Claim Ten) and informing other jurors about such relationship (Claim Eleven).  Pet. at 37-

16  40.  These claims arise from the same set of facts, which are summarized below as they

17  relate to each claim.

18       **A.  JUROR BIAS**

19          **1.  Background**

20       Towards the end of the trial, a seated juror was excused due to prepaid vacation

21  plans, and was replaced with the alternate.  27 RT 6755-6760.  The day after being

22  dismissed, that juror advised the trial court that the alternate had previously told him that

23  she was not comfortable about serving as a juror because her husband knew someone

24  sitting in the audience, i.e., Ochoa's father.  27 RT 6830-6832.  The dismissed juror

25

26         [7] Judge White of this Court previously rejected essentially the same juror bias and
misconduct claims presented in a habeas petition filed by Petitioner's co-defendant,

27  Higuera.  Higuera v. Lewis, No. C 10-5241 JSW (PR), 2011 WL 4595006, *10-13 (N.D.
Cal. Oct. 4, 2011).  Higuera appealed the denial of his habeas petition, but the Court and the

28  Ninth Circuit declined to issue a certificate of appealability.

1    returned to court, was sworn, and testified that the alternate told him a few days earlier

2    about the foregoing.  27 RT 6840-45.  Counsel for Ochoa asserted that the alternate should

3    be dismissed because she might judge his client more harshly.  27 RT 6849.

4           The trial court summoned the alternate and questioned her under oath.  27 RT 6858-

5    6863.  The alternate stated that two or three days after trial commenced, she saw the

6    Ochoas in the hallway and mentioned to another juror that she thought she knew them.

7    27 RT 6859.  The other juror suggested that the alternate should so inform the bailiff, which

8    she did.  27 RT 6859, 6868.  The bailiff responded that "it didn't matter" so long as she did

9    not know the any of the defendants or the lawyers.  Id.  Towards the end of trial (about two

10   months after it began), the alternate, upon hearing the last name of the girl mentioned,

11   realized that her husband played soccer with the man, Ochoa's father, and that the girl was

12   Ochoa's sister.  27 RT 6859.

13          At some point, possibly during trial, the alternate hosted an event at her home for

14   people associated with the soccer team.  27 RT 6859-6860.  Although Ochoa's father and

15   Ochoa's sister were present at the party, the alternate was then unaware of their connection

16   to Ochoa.  Id.  The alternate indicated that she had never spoken to the Ochoas and they

17   never looked at her in court.  27 RT 6860-861.  She also stated that her familiarity with

18   them would not affect her ability to serve as an impartial juror.  27 RT 6862.  The trial

19   court judge concluded that the alternate was not biased, and counsel for Ochoa withdrew

20   his objection.  27 RT 6863, 6867-868.

21          The other defense counsel argued that the alternate should be dismissed because her

22   relationship with Ochoa's family might affect her impartiality, and because she had

23   discussed the case outside the jury room.  27 RT 6864-6866.  However, the court found that

24   the alternate "was completely open" in "telling us exactly what the situation was," and had

25   shown "no hesitancy to explain anything." 27 RT 6868.  The court nonetheless called the

26   alternate back into the courtroom to clarify whether she had mentioned her "relationship"

27   with Ochoa's family members to any other jurors. 27 RT 6870.  The alternate responded

28   that thought a few jurors may have overheard her when she spoke to the bailiff.  27 RT

6870.  She also said she had mentioned the subject to the dismissed juror.  27 RT 6871.
After additional questioning by the court, the alternate said she did not believe her
participation on the jury would affect her relationship with her husband or his soccer team
members.  27 RT 6872. Counsel for Ochoa argued that neither the alternate or Ochoa's
family members appeared to have done anything improper, and the court agreed.  27 RT
6873.  The court added that the alternate juror had been "very forthright," and the court was
"very impressed with her ability to relate what's happened."  27 RT 6873.

The court next questioned the courtroom bailiff, who testified that the alternate had
approached him at the outset of trial and said that she might know some of the spectators in
the courtroom.  27 RT 6879-6880.  The alternate said she was unsure if or how she knew
the person (or persons), and the bailiff told her she could inform the court during voir dire.
27 RT 6880.

The court once again brought the alternate into the courtroom and questioned her
further.  The alternate testified that she thought the relatives of Ochoa had come to her
house two or three weeks earlier, and that she realized their identity with certainty "on
Friday," when she saw the man talking with counsel for Ochoa.  27 RT 6882.  In addition,
the alternate said that she had never been alone with the man and the girl, and that her last
exposure to them was "two Sundays ago" at the park. 27 RT 6882-6883.  All of the defense
attorneys, other than counsel for Ochoa, requested the dismissal of the alternate.  27 RT
6883.  The court denied the request.  27 RT 6883.

On direct appeal, the state appellate court rejected Petitioner's contention that that
the trial court's refusal to discharge the alternate denied him his right to an impartial jury.
With regard to the issue of bias, the court found that Petitioner's "arguments vastly
overstate the connection between the juror and the people she believed to be Ochoa's
family members," finding that Ochoa's father and sister were, at best, "only casual
acquaintances she had recently met, and with whom she had never been alone."  Amante,
2009 WL 2850354, *37.  In addition, the state appellate court noted that the trial court, after

appropriately questioning the alternate to ensure that she could fairly consider the evidence, found the alternate to be credible and forthcoming.  Id.

### 2.    Analysis

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  A lack of impartiality affects the Sixth Amendment right, which implicates the Fourteenth Amendment right to due process.  Id.  The right to due process is violated even if any juror is biased or prejudiced.  Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990).  However, "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.  Were that the rule, few trials would be constitutionally acceptable."  Smith v. Phillips, 455 U.S. 209, 217 (1982).

The issue of juror bias is "plainly one of historical fact:  did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."  Patton v. Yount, 467 U.S. 1025, 1036 (1984).  "[F]ederal courts must accord a presumption of correctness to state courts' findings of juror bias."  Greene v. Georgia, 519 U.S. 145, 146 (1996) (citation omitted) (per curiam).  A trial court's determination of juror bias is given "special deference," both on direct appeal and in habeas proceedings, because juror bias is largely a function of the credibility of the juror.  Patton, 467 U.S. at 1038; Maxwell v. Roe, 628 F.3d 486, 503 (9th Cir. 2010).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El, 537 U.S. at 340.

Petitioner claims, as he did on direct appeal, that the alternate had a "significant relationship with father and sister of codefendant Ochoa" and therefore was biased in favor of Ochoa, whose defense allegedly was adverse to his.  Pet. at 39.  This contention is unsupported by the record.  The trial court conducted hearings in connection with the matter of potential juror bias and misconduct, and concluded that the alternate's representation that she was not biased in favor or against any defendant was credible.

Amante, 2009 WL 2850354, *36-37.  In addition, the record developed by the trial court established that the alternate barely knew Ochoa's father or sister, that her contact with them was attenuated, and the she did not even realize that she had been acquainted with the Ochoas until towards the end of trial, two months after it began.  Id.

The trial court's factual finding that the alternate was not biased is entitled to a presumption of correctness under § 2254.  Dyer v. Calderon, 151 F.3d 970, 975 (9th Cir. 1998) ("So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness."); see also Wainwright v. Witt, 469 U.S. 412, 429 (1985) ("The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.  These are the factual issues that are subject to § 2254(d).").  That finding is presumed to be correct unless the petitioner provides clear and convincing evidence establishing that the state court's finding was erroneous.  See 28 U.S.C. § 2254(e)(1); Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004)  ("Once the state court's fact-finding process survives this intrinsic review [,] . . . the state court's findings are dressed in a presumption of correctness [ ]" and may be overturned only if new evidence presented for the first time in federal court "amounts to clear and convincing proof that the state-court finding is in error.").  Here, Petitioner has failed to demonstrate any flaw in the trial court's fact-finding process, or present any evidence, let alone clear and convincing evidence, to support his claim.  Petitioner is therefore not entitled to habeas relief on his claim of juror bias.

> **B.   JUROR MISCONDUCT**
>
> **1.   Background**

In Claim Eleven, Petitioner alleges that the alternate engaged in misconduct by informing other jurors that she recognized the Ochoas.  Pet. at 40.  On direct appeal, the court found that while Petitioner had "overstate[d] the extent and nature of the alternate's interactions with people believed to be Ochoa's family members," the alternate "technically

committed 'misconduct' by interacting with them after she recognized them in the audience at trial and discussing that fact with other jurors." <u>Amante</u>, 2009 WL 2850354, *38.[8] Nevertheless, the court found that no prejudice resulted "[i]n light of the fact that the alternate juror was not at first sure that she recognized the audience members at issue, the fact that she was only casual acquaintances with them, the fact that she never spoke with them about the trial and was never alone with them, . . ." <u>Id.</u>  In view of these circumstances, the state appellate court found that the alternate's error did not evince her inability to perform the functions of a fair and impartial juror.  <u>Id.</u>

## 2.    Analysis

Petitioner's juror misconduct claim is predicated on the alternate's "telling other jurors about her relationship with Ochoa's family members."  Pet. at *40.  Under California law, jurors are not to discuss the case prior to deliberations.  <u>See</u> Cal. Pen. Code. § 1122(a)(1) ("shall not converse among themselves . . . on any subject connected with the trial.");  <u>People v. Ledesma</u>, 39 Cal.4th 641, 723 (2006) (citing Cal. Pen. Code § 1122). Here, the trial court judge, after holding a hearing, found that while the alternate disclosed her connection to the Ochoas to two other jurors, there was no actual discussion of the case. The Court finds no error in the trial court's fact-finding process and thus presumes the trial court's finding to be correct.  <u>See Taylor</u>, 366 F.3d at 1000.  Furthermore, Petitioner has failed to demonstrate any flaw in the trial court's fact-finding process, or present any evidence, let alone clear and convincing evidence, to support his claim.

In any event, to the extent that such conduct could be construed as "premature deliberations," Petitioner has not shown that the misconduct denied him his right to a fair trial.  <u>United States v. Klee</u>, 494 F.2d 394, 396 (9th Cir. 1974).  Premature deliberations are

---

[8] In his opening brief on direct appeal, Petitioner did not allege that the alternate engaged in misconduct by having contact with the Ochoas during trial.  <u>See</u> Ex. A at 100-103.  Nor did he raise such a claim in his Petition, though he belatedly alleges as such in his Traverse.  Traverse at 26.  Since that claim was not raised in the Petition, it is not properly before the Court.  <u>See Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief.").  In any event, Petitioner has made no showing that such a violation had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 623.

1  "not as serious" as most other forms of misconduct, such as "private communication,

2  [outside] contact or tampering" with a juror during trial.  Davis, 384 F.3d at 653.  "A

3  petitioner must allege facts which, if proved, would show that the premature deliberations

4  prejudiced him to the extent that he did not receive a fair trial."  Belmontes v. Brown, 414

5  F.3d 1094, 1124-25 (9th Cir. 2005)), overruled on other grounds by Ayers v. Belmontes,

6  549 U.S. 7 (2006).  No such showing of prejudice has been made.  Accordingly, neither the

7  trial court's decision to retain the alternate nor the state appellate court's decision was

8  objectively unreasonable in light of the evidence presented in the state court proceeding.

9  Petitioner is not entitled to habeas relief on his juror misconduct claim.

10 **IX.   CUMULATIVE ERROR**

11        In his twelfth and final claim, Petitioner alleges that the alleged constitutional errors,

12 considered cumulatively, justify the grant of habeas relief.  However, in view of the Court's

13 findings above, Petitioner's claim of cumulative error necessarily fails.  See Hayes v.

14 Ayers, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of

15 constitutional magnitude occurred, no cumulative prejudice is possible.").

16 **X.    CONCLUSION**

17        The Court finds no merit to any of Petitioner's claims.  No certificate of

18 appealability is warranted in this case.  For the reasons set out above, no jurist of reason

19 would find this Court's denial of Petitioner's claims "debatable or wrong."  See Slack v.

20 McDaniel, 529 U.S. 473, 484 (2000).   Accordingly,

21        IT IS HEREBY ORDERED THAT the Petition for Writ of Habeas Corpus is

22 DENIED as to all claims, and a certificate of appealability will not issue.  The Clerk shall

23 close the file and terminate all pending matters.

24        IT IS SO ORDERED.

25 Dated:  9/30/14

26                                        SAUNDRA BROWN ARMSTRONG
                                         United States District Judge
27

28